Peter R. Afrasiabi (SBN 193336)
Email: pafrasiabi@onellp.com
**ONE LLP**
23 Corporate Plaza, Suite 150
Newport Beach, CA 92660
Telephone:   (949) 502-2870
Facsimile:    (949) 258-5081

Attorney for Plaintiff,
NEUROPTICS, INC.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

| | |
|---|---|
| NEUROPTICS, INC., a California corporation, <br><br> Plaintiff, <br><br> v. <br><br> SOLVEMED, INC., a Delaware corporation; and DOES 1-10, inclusive, <br><br> Defendants. | Case No. <br><br> **COMPLAINT FOR:** <br> (1) **FEDERAL FALSE DESIGNATION OF ORIGIN (15 U.S.C. § 1125);** <br> (2) **FEDERAL FALSE ADVERTISING (15 U.S.C. § 1125);** <br> (3) **COMMON LAW UNFAIR COMPETITION; AND** <br> (4) **STATE UNFAIR COMPETITION (CAL. BUS. & PROF. CODE § 17200 ET SEQ.)** <br><br> **DEMAND FOR JURY TRIAL** |

**COMPLAINT**

Plaintiff, by and through its attorneys of record, complains against Defendants as follows:

## PARTIES

1. Plaintiff NeurOptics, Inc. ("NeurOptics" or "Plaintiff") is a California corporation with its principal place of business in Irvine, California.

2. On information and belief, Defendant Solvemed, Inc. ("Solvemed" or "Defendant") is a corporation organized under the laws of Delaware, registered in California, and has its principal place of business in Poland.

3. DOES 1-10, inclusive, are unknown to Plaintiff, who therefore sues said defendants by such fictitious names. Plaintiff will ask leave of Court to amend this Complaint and insert the true names and capacities of said defendants when the same have been ascertained. Plaintiff is informed and believes, and upon such alleges, that each of the defendants designated herein as a "DOE" are legally responsible in some manner for the events and happenings herein alleged, and that Plaintiff's damages as alleged herein were proximately caused by such defendants.

## JURISDICTION AND VENUE

4. This action arises under the trademark laws of the United States, 15 U.S.C. § 1051 et seq., particularly under 15 U.S.C. § 1125, as well as state claims for unfair competition. This Court has jurisdiction of the federal claims under 28 U.S.C. §§ 1331 and 1338, and 15 U.S.C. §§ 1116, 1121, and 1125. This Court has supplemental jurisdiction over the state law claims under 28 U.S.C. §§ 1367(a) and 1338(b), those claims being joined with a substantial and related claim under the Lanham Act of the United States and so related to the federal claims that they form part of the same case or controversy and derive from a common nucleus of operative fact.

5. Plaintiff is informed and believes that this Court has personal jurisdiction over Solvemed because, *inter alia*, Defendant is a business that conducts business in California, operates an office in California, advertises its services in

California to California residents and the relevant California market directly and in-person outreach marketing efforts and via its website www.solvemed.ai, and has engaged in the specific conduct alleged herein.

6. Venue is proper in this District under 28 U.S.C. § 1391 as the claim arises in this judicial district, and the injury suffered by Plaintiff took place in this judicial district.

## GENERAL ALLEGATIONS

7. NeurOptics was founded in 1998. It makes pupilometers and is the pioneer in the field of pupillometry. Pupilometers are medical instruments that measure the size and reactivity of a person's pupils, typically to assess neurological function, particularly in the setting of medical emergencies. Between 1998 and 2005, NeurOptics conducted research and development and spent millions of dollars to develop its first pupilometers. NeurOptics pupilometers are highly sensitive and complex medical instruments that have been validated for clinical use in hospitals. These instruments capture the response of a patient's pupil to a burst of light from the pupilometer, and they instantly measure multiple pupillary response variables, including, minimum pupil size, baseline pupil size, constriction amplitude, constriction latency, and constriction velocity. NeurOptics's pupilometers aggregate all of this data, apply a proprietary algorithm to the data, and convert it into a self-created single scalar value (a single number) it calls a Neurological Pupil Index or NPi®. On the numeric NPi scale, an NPi from 3.0 to 5 is considered normal, while an NPi less than 3.0 is considered abnormal. This self-created scale of below 3 or 3 and above provides an objective, accurate and easy-to-interpret way to quantify and trend a patient's pupillary response, offering increased confidence in the neurological assessment.

8. Prior to NeurOptics's development of its pupilometers and its objective NPi scale of below 3 or 3 and above, pupil assessment had been performed in a subjective manner, using a penlight or flashlight to manually evaluate pupil

3

**COMPLAINT**

reactivity and a pupil gauge to estimate pupil size. This approach relied on subjective evaluation of clinicians and was not optimal. NeurOptics's pupilometers and its NPi® scale of below 3 or 3 and above was a pioneering achievement. This one scalar value created by NeurOptics has led to objective and reliable pupillary assessment of critically ill patients in acute care settings such as the Emergency Department (ED), Intensive Care Unit (ICU), Operating Room (OR), Post Anesthesia Care Unit (PACU), Progressive Care Units (PCU), and diagnostic areas such as Interventional Radiology (IR).

a.       The choice of below 3 for abnormal and 3 and above for normal that is the choice of 3 as a numerical representative location to separate normal from abnormal, was arbitrarily selected as the scoring system mark and designation to offer the marketplace. This particular scale of below 3 or 3 and above has no independent function in and of itself. The specific "3" scale is non-functional within the meaning of the Lanham Act because the underlying pupillary measurements could be expressed through any number of arbitrary numerical ranges (such as, e.g., 1-10, 15–25, 100–200, A-D, 1x-10x, etc.) without affecting the accuracy, cost, or operation of the pupilometers. The "3" scale was selected arbitrarily as a method of presenting results. Therefore, it functions not as a utilitarian feature but as part of the arbitrary source-identifying system associated with Plaintiff's NPI® pupilometers.

b.       Through extensive and continuous use in interstate commerce, NeurOptics's above 3 or below 3 NPi scale, has acquired distinctiveness and secondary meaning within the medical industry. Hospitals, clinicians, and purchasers of pupilometers have come to recognize and associate the NPi above 3 or below 3 scale with NeurOptics as the source of the instruments that generate those scores. As a result of Plaintiff's longstanding and exclusive use, promotion, and widespread adoption of the above 3 or below 3 scale in healthcare settings, the scale functions as a source-identifying designation in the marketplace.

**COMPLAINT**

c.    The underlying science of NeurOptics's methodology did not naturally demand that "3" be the line of demarcation between normal and abnormal or the number range around 3.

9.    NeurOptics has spent years and significant financial investments educating clinical medical professional and users of its device, its science, its technology, and its self-created "3" scale. It has done this by producing brochures and training materials describing and explaining the NPi "3" scale. It has presented at conferences and it has published scientific papers referencing this scale.

10.    As of 2026, NeurOptics devices are in over 1,000 U.S. hospitals and 2,500 separate departments within those hospitals. In 2025 alone, more than 500,000 patients were evaluated using NeurOptics devices. NeurOptics's "3"-based approach is widely used in emergency departments, ICUs, and neurocritical care settings to assess normal/abnormal pupil reactivity.

11.    Through nearly two decades of development, validation, publication, clinical education, and widespread hospital deployment, NeurOptics's trademark and designation—with "3" as the line between normal and abnormal—is both inherently distinctive and has acquired substantial secondary meaning in the relevant market and is closely associated with NeurOptics. NeurOptics created this arbitrary mark and designation itself, has used it exclusively, has invested decades of research and investment in developing the mark and in educating users about it to the point that the market understands that a score of 3 is the normal-abnormal line.

12.    NeurOptics's trademark and designation is a known designation now in hospitals due to the effort and ingenuity of Plaintiff and its marketing of its device and methodology over more than 15 years. Medical professionals use the "3" scale to make life and death decisions for their patients.

13.    Several years after NeurOptics established and widely disseminated its scale using 3 as the normal-abnormal demarcation point, Solvemed began online

5

**COMPLAINT**

claims that it had a smartphone app-based pupil measurement system ostensibly to also score pupil responsiveness.

14.    Solvemed's methodology is not the same as Plaintiff's nor a reformulation of Plaintiff's. It is instead based on different equations and models and in part on machine learning guesstimates and algorithms used on an iPhone instead of an actual validated medical device like Plaintiff's device. Indeed, Solvemed's methodology is completely different to Plaintiff's.

15.    The output of Solvemed's algorithm first produces an internal pupil reactivity score whose natural range is considerably broader than the values ultimately displayed to clinicians. Instead of presenting that score on its native scale, the application transforms the output so that it falls within the same 0–5 numerical range with 3 as the line between normal and abnormal used by NeurOptics's NPi® scale. This transformation places Solvemed's results into the same numerical and interpretive framework clinicians already associate with Neuroptics's NPi, despite the fact that the underlying scoring methodology is different and independently derived.

16.    Instead, and without the consent of Plaintiff, Solvemed intentionally maps the internally generated score produced by its algorithm onto the same 0–5 numerical range used by NeurOptics's NPi scale and applies the identical threshold value of 3 within that range to separate normal from abnormal pupil reactivity. By transforming its internally generated score into this 0–5 scale and adopting the same above-3/below-3 interpretive framework associated with NeurOptics's NPi, Solvemed places its results into the interpretive framework clinicians already associate with NeurOptics's NPi metric, thereby creating the misleading appearance that the two indices are equivalent or comparable. It now calls its score the "PuRe" score.

17.    Indeed, when Solvemed first marketed itself in its literature, it expressly called its scale the "Neurological Pupil Index", "NPX" scale, but then

COMPLAINT

after Plaintiff alerted it to the theft and improper use of the NeurOptics's Neurological Pupil Index NPI name, it changed the name to "PuRe."

18.    But Solvemed did not change its use of Plaintiff's chosen number to demark normal and abnormal, and Solvemed continues to intentionally copy and use Plaintiff's arbitrary and marketplace-known above 3/below 3 mark to define normal and abnormal, all part of its attempt to steal the goodwill and marks and designations of NeurOptics.

19.    Now Solvemed has actually entered the market and its representatives have appeared at major academic medical centers and have represented to clinicians that their index is equivalent to NeurOptics's index, including by using the same threshold of 3 to define normal versus abnormal.

20.    Solvemed has even falsely claimed that the above 3/below 3 mark and designation is an "industry standard" in an intentional effort to try to delimit and appropriate NeurOptics's intellectual property creation and designation. But NeurOptics's choice of 3 is not an "industry standard" anymore than "Happy Meal" is an industry standard term all fast-food outlets can use for combo fast food lunch meals: it is NeurOptics's self-created, arbitrary scale for its device and methodology and unique to NeurOptics. That is, the NeurOptics scale is not some sort of external industry standard or scale set by an external standards body or product of nature; it is simply proprietary to NeurOptics that it created and used as the arbitrary numbering system it chose to use as a designation in commerce to separate populations and scores on tests between normal and abnormal given NeurOptics's methodology. NeurOptics's success in educating the market about its product and its chosen scale reference of 3 as the line between normal and abnormal does not make it an industry available mark, designation or term open to anyone.

21.    Solvemed has also falsely claimed that its scale is identical to NeurOptics's, trying to convince the market that above 3 and below 3 is all the same no matter who uses it. At Duke University, NeurOptics was forced to explain that

7

**COMPLAINT**

the scales are not the same, that the NeurOptics scale is based on its peer-reviewed validated methodology and algorithm whereas Solvemed is simply taking a different methodology it uses and forcibly converting it to an above 3 or below 3 scale. Solvemed does this to confuse the market into believing that it carries the science and safety of NeurOptics's scale since each have "3" as the normal/abnormal line of demarcation and since NeurOptics has invested in educating relevant consumer about its products and science and the use of 3 in those services and products.

22.     Solvemed's advertising augments consumer confusion because it advertises claims about NeurOptics's pupil reactivity changes in patients hovering at 3.0 and how such changes at reading levels can be misinterpreted and how its product gets a clearer reading at 3, but the very data it purports to cite for the alleged misinterpretation is in studies only of NeurOptics's methodology. Because Solvemed's methodology is totally different and has been intentionally forced by it onto an above 3, below 3 scale so as to take advantage of NeurOptics's above 3, below 3 marketplace designation and simply to use the same designation of Plaintiff, this creates further consumer confusion, and also false advertising, that if its product yields a "3" that somehow there is the same impact, clinical equivalence or better trusted result than NeurOptics's "3" results.

23.     On information and belief, at in-servicing presentations, Solvemed personnel have told clinicians that the "PuRe" index is the same as NeurOptics's index. This claim is false and misleading and further creates consumer confusion and damage to NeurOptics. It also puts patients at risk of harm.

24.     On information and belief, Solvemed has done this campaign to copy the marks and designations of NeurOptics. It has done this because NeurOptics has created the market and designation and relevant consumer understanding for above 3, below 3 as a line of demarcation understood by professionals using its products and services to gauge eye reactivity into normal-abnormal camps, and because NeurOptics has educated its customer base and clinical professionals on its device

8

COMPLAINT

and its "3" line. Rather than create its own scale or scoring system to offer professionals for its different product and service, which utilizes a totally different methodology to gauge pupil reactivity and which efforts would entail great cost over many years of effort and education, Defendant wants instead to equate itself to NeurOptics and plug into and pirate NeurOptics's marketing and marketplace brand recognition by using the same arbitrary "3" mark to define normal and abnormal since consumers understand from NeurOptics's years of efforts and investment that 3 is the normal/abnormal line for NeurOptics's product.

25.    Just as NeurOptics settled on its arbitrary mark to use for its product, Solvemed can use any number of methods to represent its output. Indeed, there are a near infinite set of possibilities based on the broader internal scoring range generated by its algorithm. It can use letters, or other combinations of number, letters, or symbols so long as they are not confusingly similar to Plaintiff's single and arbitrary mark and designation choice.

## FIRST CAUSE OF ACTION

### (Federal False Designation of Origin - 15 U.S.C. § 1125(a))

### (By Plaintiff against All Defendants)

26.    NeurOptics repeats, realleges, and incorporates Paragraphs 1-25 as though fully set forth in this cause of action.

27.    Prior to any use in commerce of the above 3, below 3 designations by Defendants as outlined above, NeurOptics used it in connection with its brand and service offerings.

28.    Defendants' use in commerce of the same designation in connection with pupillometry is likely to cause confusion, to cause mistake, or to deceive consumers, who are likely to believe erroneously that Defendants originate from the same source as NeurOptics, or that Defendants are otherwise affiliated, connected, or associated with NeurOptics, or are sponsored or approved by NeurOptics.

COMPLAINT

29. Defendants have knowingly and willfully infringed NeurOptics's rights and engaged in this false description of fact in commerce by deliberately exploiting the goodwill associated with NeurOptics's designation and by deliberately misrepresenting Defendants' products in commerce. Defendants' false designation of origin is thus knowing, willful, and deliberate, making this an exceptional case under 15 U.S.C. § 1117.

30. NeurOptics has no adequate remedy at law. Defendants' conduct as alleged herein has caused, and if not enjoined, will continue to cause irreparable harm to NeurOptics's rights and to its business reputation and goodwill, as well as cause damages that cannot accurately be computed at this time but will be proven at trial.

**SECOND CAUSE OF ACTION**

**(Federal False Advertising - 15 U.S.C. § 1125(a))**

**(By Plaintiff against All Defendants)**

31. NeurOptics repeats, realleges, and incorporates Paragraphs 1-25 as though fully set forth in this cause of action.

32. Defendants have implied and made false statements of fact about their products in advertisements and at trade shows to the medical community.

33. Among the false statements made by Defendants were representations that its scaling is the same or equivalent to NeurOptics or that the NeurOptics above 3, below 3 approach is simply an industry defined standard.

34. NeurOptics is informed and believes and, on that basis, alleges that Defendant's pupillometer product is based on different underlying methodologies and that its purported above/below-3 scale is not the same as Plaintiff's. Indeed, Defendant's methodology is not derived from the validated data underlying Plaintiff's NPi metric and instead first generates an internal score on a broader native scale based on an entirely different methodology. Defendant then transforms that internally generated score so that it falls within the same 0–5 numerical range

10

**COMPLAINT**

used by the Neuroptics NPi metric, and adopts the identical threshold value of 3 within that range to define normal versus abnormal pupil reactivity. By mapping its results into this 0–5 NPi-style scale and above-3/below-3 interpretive framework, Defendant creates the misleading appearance that its index is equivalent to or comparable with the NeurOptics NPi metric when it is not.

35. The false statements actually deceived or had the tendency to deceive a substantial segment of the consuming audience that was exposed to the statements.

36. The deception was material, in that it was likely to influence the purchasing decision of the consuming audience.

37. Defendants caused the false statements to enter interstate commerce. Defendants were aware of Plaintiff's business and the fact that its pupillometer product is competitive with Plaintiff's.

38. Plaintiff suffered a commercial injury as a result of the false statement by direct diversion of sales, by confronting false understandings of the technologies, and by having to correct medical professional and industry understanding of the technology.

39. Defendants' actions constitute a violation of the Lanham Act. Pursuant to 15 U.S.C. § 1117(a), the Court may award Plaintiff up to three times the damages sustained he sustained, as well as Defendants' profits.

40. The conduct of Defendants was willful and deliberate, and this case is therefore an "exceptional" case under 15 U.S.C. § 1117(a) such that Plaintiff is entitled to recover its reasonable attorneys' fees.

**THIRD CAUSE OF ACTION**

**(Common Law Unfair Competition)**

**(By Plaintiff against All Defendants)**

41. NeurOptics repeats, realleges, and incorporates Paragraphs 1-40 as though fully set forth in this cause of action.

11

**COMPLAINT**

42.    By virtue of their conduct as alleged herein, Defendants have engaged and are engaging in unfair competition and passing off under California common law. Defendants are causing competitive injury and damages to NeurOptics by deliberately misleading the marketplace into believing that their "3" scale is the as the same as or equivalent to Plaintiff's "3" scale.

43.    As well as harming the relevant public, Defendants' conduct as alleged herein has caused and will continue to cause NeurOptics irreparable harm and injury for which there is no adequate remedy at law and is also causing damage to NeurOptics in an amount which cannot be accurately computed at this time but will be proven at trial.

44.    Defendants' actions were undertaken intentionally to obtain an unfair advantage over NeurOptics and in conscious disregard of NeurOptics's rights. Defendants' actions were malicious, oppressive, and/or fraudulent, entitling NeurOptics to punitive or exemplary damages under Cal. Civ. Code § 3294(a) to punish and deter Defendants.

## FOURTH CAUSE OF ACTION

**(California Statutory Unfair Competition - Cal. Bus. & Prof.**

**Code § 17200 et seq.)**

**(By Plaintiff against All Defendants)**

45.    NeurOptics repeats, realleges, and incorporates Paragraphs 1-44 as though fully set forth in this cause of action.

46.    Defendants' use in commerce of the designations and marks in connection with offering of competing products violates NeurOptics's rights, and is a willful and intentional attempt to trade on NeurOptics's goodwill, reputation, and financial investment, and is an unfair, unlawful and fraudulent business practice. Defendants' false advertising as alleged above, including without limitation claims that its index is the same as Plaintiff's, is also an unfair, unlawful and fraudulent business practice.

**COMPLAINT**

47.   By reason of Defendants' conduct as alleged herein, Defendants have engaged in unlawful, unfair, and/or fraudulent ongoing business practices in violation of Cal. Bus. & Prof. Code § 17200.

48.   As a direct result of Defendants' unfair competition, Defendants have unlawfully acquired, and continue to acquire on an ongoing basis, an unfair competitive advantage and have engaged in, and continue to engage in, wrongful conduct to Defendant's monetary advantage and to the injury and detriment of NeurOptics.

49.   Defendants' illegal and unfair business practices are continuing, and injunctive relief under § 17203 is necessary to restrain further violations.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants, as follows:

1.   For an order preliminarily and permanently enjoining Defendants, their subsidiaries, parent and affiliated companies, successors, assigns, officers, directors, agents, partners, servants, employees, licensees, licensors and attorneys of those companies or individuals, and all others in active concert or participation with Defendant, from:

a.   using the NeurOptics "3" scale with above 3/below 3 as normal/abnormal designations and marks, within a broader boundary of zero to five, as applied to scoring pupil reactivity, and any other mark, word, or name that is likely to cause confusion, in Defendant's products and promotional, advertising and marketing materials;

b.   publishing any false statements of fact about NeurOptics; and

c.   engaging in any false advertising that implies Defendant's services or scaling is affiliated with, sponsored by, or similar to NeurOptics or that Solvemed's scaling store is clinically or materially equivalent to or similar to NeurOptics.

13

**COMPLAINT**

d.      Engaging in unfair, unlawful and fraudulent business practices as outlined above.

2.      Directing Defendants to regularly file with the Court and serve on NeurOptics an affidavit setting forth in detail the manner and form in which it has complied with the terms of the injunction;

3.      Requiring Defendants to account for and pay to NeurOptics the amount of all profits derived by Defendants as a result of the acts alleged in this action;

4.      Directing Defendants to pay to NeurOptics the amount of all damages incurred by NeurOptics by reason of Defendants' misconduct alleged in this action, such amount to be proven at trial;

5.      For trebling of any damages award under 15 U.S.C. § 1117;

6.      For compensatory damages;

7.      For corrective advertising;

8.      For an assessment of punitive damages against Defendants to punish and deter Defendants and others from engaging in similar conduct in the future;

9.      For costs of this action, together with reasonable attorneys' fees finding this an exceptional case under the Lanham Act; and

10.     For any such other and further relief as the Court deems just and equitable.

Dated:  March 20, 2026                          **ONE LLP**


                                                By: /s/ Peter R. Afrasiabi
                                                    Peter R. Afrasiabi

                                                Attorneys for Plaintiff,
                                                NeurOptics, Inc.

14

**COMPLAINT**

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury as to all claims and all issues properly triable thereby.

Dated:  March 20, 2026                    **ONE LLP**

By: /s/ Peter R. Afrasiabi
    Peter R. Afrasiabi

Attorneys for Plaintiff,
NeurOptics, Inc.

15
**COMPLAINT**